UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00191-GNS-LLK

HUTSON, INC.                                                                                      PLAINTIFF

v.

WALTER C. WINDSOR                                                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon the Motion for Partial Summary Judgment of Plaintiff Hutson, Inc. ("Hutson"), on Counts I, II, and IV of Defendant's Counterclaim (DN 52). The motion is fully briefed, and is ripe for decision. For the reasons outlined below, the motion is **GRANTED** on Counts I and II, but **DENIED** on Count IV.

### I.   STATEMENT OF FACTS AND CLAIMS

This dispute arises out of a series of agreements by which Hutson acquired assets and inventory from Premier Development Company, Inc. ("Premier"), an international agricultural equipment and parts corporation. As part of the agreements, Walter Windsor ("Windsor"), who served as president and shareholder of Premier until late 2010, became an employee of Hutson. Additionally, there is a dispute as to Hutson's liability for comments made by Patrick Lewis ("Lewis") to a third party after Windsor was terminated by Hutson.

Prior to Hutson's acquisition of some of the company's assets, Premier had been a customer of Hutson and had accumulated nearly $100,000 in debt on past due invoices. According to Hutson, the agreements at issue were entered into after discussions with Windsor relating to Premier's past-due accounts. Ultimately, Hutson agreed to purchase certain articles of

Premier's inventory, hire Windsor as an employee, and provide him with a $250,000 loan to assist him with paying off debts he had at that time. (Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. 2-3, DN 52-1). The agreements were consummated on August 19, 2011, in the form of an Inventory Sales Agreement, an Employment Agreement, and a Promissory Note. (Am. Compl. Exs. 1-3, DN 36-1 to 36-3). The Employment Agreement set forth the term of Windsor's employment, including a covenant not to compete, an agreement to work exclusively for Hutson, and a clause defining the employment relationship as "at will." (Am. Compl. Ex. 2, DN 36-2).

Windsor, however, asserts that he was approached by Hutson about purchasing the business of Premier because of Hutson's desire to become involved in the sale of agricultural equipment and parts internationally, and to have Windsor take charge of developing business in Europe and Latin America. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 2-3, DN 57). According to Windsor, he agreed to the business relationship solely because of representations by Barry Carson, Hutson's president, that the partnership would provide Windsor with a "nearly limitless environment" and that the partnership would "exceed [Windsor's] projections by 25% minimum by year 2013." (Def.'s Decl. I Ex. 1 at 1, DN 43). Windsor contends that Carson made additional promises that Hutson would provide credit terms that were more favorable to customers than Premier could offer and that Windsor's earned commissions at Hutson would far exceed his income at Premier. (Def.'s Decl. I ¶ 14).

According to Windsor, he entered into the promissory note and Employment Agreement in reliance on these representations, believing that the proceeds of the sale and his commissions would be "more than sufficient to pay off the note," and that the partnership would be "economically advantageous." (Def.'s Decl. I ¶ 17). After starting with Hutson, however, Windsor contends that the company did not provide credit terms "equal to or better than what

Premier had provided customers," (Def.'s Decl. I ¶ 21), and it did not provide Windsor with "independence to operate and manage the international operations." (Def.'s Decl. I ¶ 24). Windsor asserts that because of Hutson's actions he was unable to "make anywhere close to the sales [he] had projected." (Def.'s Decl. I ¶ 26). Windsor contends that the representations made by Carson amount to fraud, and that Hutson's failure to provide favorable credit terms, sufficient resources, and independence was a breach of the Employment Agreement. (Countercl. 19, DN 42).

Finally, Windsor asserts that during his tenure he introduced Hutson to a prominent Romanian farmer, Mihai Anghel ("Anghel"), to whom Hutson sold nearly $1,000,000 in equipment and parts shortly after Windsor was terminated. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 5). According to Windsor, as a part of the negotiations for this sale, Lewis, acting as an agent of Hutson, made defamatory statements about Windsor to Anghel, as well as to Hutson employees Andrew Ellison ("Ellison") and Andrei Costea. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 5). While Hutson asserts Lewis's legal status was that of an independent contractor and not an employee, Windsor states that Lewis was "actively involved and engaged in the day to day operations associated with international sales of agricultural equipment and parts;" traveled to trade shows with Hutson employees; distributed business cards to customers for Global Ag Solutions, a sister company of Hutson; and represented himself to customers as "someone who was a representative of the international sales operation / Global Ag Solutions and could speak for the company"; and that this conduct was indicative of Lewis acting as an agent of Hutson. (Def.'s Decl. II ¶ 12, DN 58).

Plaintiff, Hutson, filed its Motion for Partial Summary Judgment on March 6, 2015. Hutson cites the Court's order granting summary judgment as to Count I in the Amended

3

Complaint, ordered on November 4, 2014, as foreclosing Windsor's claim of fraud. Hutson further claims that Windsor has failed to produce evidence that Hutson's conduct was a breach of the terms of the Employment Agreement. (Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. 3-4). Finally, Hutson asserts Windsor has failed to provide sufficient evidence to raise a genuine dispute of material fact as to Lewis's status as an agent of Hutson at the time of the allegedly defamatory comments as grounds for summary judgment. (Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. 4).

## II.   **STANDARD OF REVIEW**

Summary judgment is appropriate if the moving party can establish that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact . . . ." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (citation omitted). The burden initially falls on the moving party to inform the district court of the basis of its motion, either by identifying those portions of the record supporting its position or by demonstrating the absence of evidence to support one of the essential elements of the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). The nonmoving party in this action must present more than a "mere scintilla of evidence" in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

4

(1986)). Finally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

### III. DISCUSSION

#### A. Count I: Breach of Employment Agreement

Windsor's claim of breach of the Employment Agreement is predicated on Hutson's alleged failure to, among other things, "provide Windsor with the financial resources and support necessary to develop business, provide [Windsor] with the level of independence and responsibility promised for his role," and to "provide customers of Windsor with the credit and service terms and support facilities [Windsor] had been promised would be available." (Countercl. 10). None of these obligations on the part of Hutson, however, are contained within the language of the contract. (Am. Compl. Ex. 2, DN 36-2). Instead, the explicit terms of the Employment Agreement oblige Hutson to employ Windsor on an at-will basis, compensate Windsor on a pure commission basis, allow Windsor to participate in various benefit plans available to Hutson employees, and pay reasonable business travel expenses. (Am. Compl. Ex. 2, DN 36-2). Windsor makes no claims that Hutson failed to comply with any of these duties during his tenure with the company. Thus, Windsor has failed to direct the court to any material obligation on the part of Hutson that the Company failed to fulfill.

While the additional contract terms claimed by Windsor are not explicitly contained within the agreement, he asserts that they were essential to the formation of the contract, inducing his agreement to form the partnership, and thus remain a basis for this court to find a breach on the part of Hutson. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 4). Even assuming these terms were part of negotiations and discussions prior to the formation of the agreement, the terms of an unambiguous contract cannot be varied by extrinsic evidence. *O.P. Link Handle Co.*

*v. Wright*, 429 S.W. 2d 842, 844 (Ky. 1968). Such extrinsic or parol evidence includes oral statements or writings made prior to or contemporaneous with the written agreement, and may not be introduced to contradict, vary, or alter the language of the document. *See, e.g.*, *Luttrell v. Cooper Indus., Inc.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998). The Employment Agreement between Hutson and Windsor lacks any ambiguity and by its own language contains the "entire understanding of the parties" with regard to the employment relationship. (Am. Compl. Ex. 2 at 5). Thus, the document sets forth Hutson's obligations under the agreement, none of which Windsor claims to have been breached, and these additional terms are appropriately excluded from consideration. *See Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) ("In general, a 'merger clause' is a contractual provision to the effect that the written terms of the contract may not be varied by *prior agreements* because all such agreements have been merged into the written document." (internal quotation marks omitted) (citation omitted)); *Bryant v. Troutman*, 287 S.W.2d 918, 920 (Ky. 1956) ("When the negotiations are completed by the execution of the contract, the transaction, so far as it rests on the contract, is merged in the writing.").

      Windsor further argues that, even excluding the unincorporated representations by Hutson, Hutson's conduct constitutes a breach of an implied covenant of good faith and fair dealing. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 11). Citing precedent for recognizing the implied covenant, Windsor claims that Hutson's conduct "handcuffed Windsor's ability to make sales" and prevented him from carrying out the "essential purposes of the contract." (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 11). Hutson's failure to fulfill the implied covenant would, according to Windsor, absolve him of any obligations under the agreement. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 11).

The precedents cited by Windsor in support of an implied covenant of good faith and fair dealing, however, are inapplicable as each falls outside of the employment context. *See Rainier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (concluding that a bank breached its implied covenant of good faith and fair dealing when it failed to give private lender notice of its subsequent loan to debtor"); *Crestwood Farm Bloodstock v. Everest Stables. Inc.*, 751 F.3d 434, 445 (6th Cir. 2014) (holding that there was a breach of the implied covenant after a party deliberately blocked the sale of a horse). The dispute in this case concerns the terms of the Employment Agreement, which explicitly defines Windsor's employment as being "at-will." Kentucky law "does not recognize a claim of breach of the covenant of good faith and fair dealing in the employment context." *Wells v. Huish Detergents, Inc.*, 19 F. App'x. 168, 178 (6th Cir. 2001) (citing *McCart v. Brown-Forman Corp.*, 713 F. Supp. 981, 983 (W.D. Ky. 1988)); *Peavey v. Univ. of Louisville*, 843 F. Supp. 2d 620, 630 (W.D. Ky. 2011); *Beard v. McCammish Mfg. Co.*, No. Civ.A.1:03 CV-107-R, 2003 WL 23811678, at *3 (W.D. Ky. Dec. 9, 2003). Because the parties agreed that Windsor's employment was "at-will," under Kentucky law Hutson was free to discharge Windsor for good cause, for no cause, or for a morally indefensible cause and could not be required to adjust its practices to foster Windsor's success absent a specific provision of the agreement. *See Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983) ("[O]rdinarily an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." (citations omitted)).

Finally, Windsor's claim that a genuine issue of fact exists as to whether Hutson dismissed Windsor in bad faith to avoid paying commissions fails because it ignores Kentucky's "at-will doctrine," which allows liberal dismissal power to employers. *See Wymer v. JH Props.,*

*Inc.*, 50 S.W.3d 195, 198 (Ky. 2001). Because Kentucky does not recognize an implied covenant of good faith and fair dealing in the employment context, the only recognized exceptions to the liberal "at-will doctrine" are "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment" and "when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Grzyb v. Evan*, 700 S.W.2d 399, 402 (Ky. 1985) (citation omitted) (internal quotation marks omitted). Windsor's claim of improper dismissal does not fall within either of these recognized exceptions. Moreover, Windsor has failed to present any facts in support of his argument of bad faith dismissal; bare conclusions, unsupported by any factual basis, will not stave off summary judgment.

Windsor has failed to present any facts showing Hutson was in breach of the terms of the Employment Agreement. Furthermore, Hutson's actions do not constitute a breach as Kentucky law does not recognize an implied covenant of good faith and fair dealing in the employment context. As the party bearing the burden of proof, Windsor has failed to demonstrate that there is sufficient evidence from which a reasonable jury could rule in his favor. For the foregoing reasons the Plaintiff's Motion of Partial Summary Judgment, as to Count I, is granted.

  **B.** **Count II: Fraud**

This Court previously granted summary judgment in Hutson's favor on the issue of Windsor's default on the Promissory Note. (Mem. Op., DN 48). In doing so, this Court found that "Windsor's affirmative defense of fraudulent inducement must fail." (Mem. Op. 7). As Windsor has failed to present any additional facts to support a claim of fraudulent inducement and his counterclaim mirrors the previously unsuccessful affirmative defense, an identical

analysis dictates that Windsor's claim of fraud in the inducement must fail and summary judgment should also be granted on Count II in favor of Hutson.

Kentucky law requires six elements for an action for fraudulent misrepresentation: "(a) a material representation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury." *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. App. 1978) (citation omitted); *accord United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Windsor must demonstrate that there is a genuine dispute of material fact as to each element of the claim in order for summary judgment to be found improper. *Hartsel*, 87 F.3d at 799. Claims of fraud carry a particularly high burden, requiring a showing of "clear and convincing evidence" in order to avoid summary judgment. *See e.g., White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 946 (6th Cir. 1990) ), *overruled in part on other grounds*, *Eyerman v. Mary Kay Cosmestics, Inc.*, 967 F.3d 213, 217 n.4 (6th Cir. 1992) ("Where the allegation is fraud, summary judgment may be granted unless there is sufficient probative evidence produced which, if believed, would clearly and convincingly establish fraud."); *Fifth Third Bank v. Canfield*, No. 3:12-CV-00603-CRS, 2013 WL 5966886, at *3 (W.D. Ky. Nov. 8, 2013) (citing *White*).

Kentucky law requires that "a misrepresentation, to be actional, must concern an existing or a past fact, and not a future promise, prophecy, or opinion of a future event, unless declarant falsely represents his opinion of a future happening." *Steele v. Liberty Life Ins. Co.*, No. 2008-CA-000722-MR, 2009 WL 1562940, at *4 (Ky. App. June 5, 2009) (quoting *Ky. Elec. Dev. Co.'s Receiver v. Head*, 68 S.W.2d 1, 3 (Ky. 1934)) (internal quotation marks omitted); *see also Mario's Pizzeria, Inc. v. Fed Sign & Signal Corp.*, 379 S.W.2d 736, 740 (Ky. 1964) (a claim for fraudulent misrepresentation "cannot be predicated upon statements which are promissory in

9

their nature . . . or upon failure to fulfill an agreement to do something at a future time or to make good subsequent conditions which have been assured." (quoting 24 Am. Jur. *Fraud and Deceit* § 267) (internal quotation marks omitted)).

All of the promises Windsor attributed to Hutson were merely predictions of future events and do not represent past or present material facts. Windsor claims that Hutson's denial of making the assurances demonstrates that an issue of fact remains for the jury to decide, (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 13); however, as the Court has previously ruled, such a dispute does not raise an issue as to *material* facts. (Mem. Op. 6).

Furthermore, Windsor has still failed to present facts to support the premise that Hutson knew that its alleged promises to Windsor would never materialize. Any such evidence would continue to be barred by the parol evidence rule as parties may "not base fraud in the inducement claim[s] on their reliance on oral representations contrary to the terms of written agreements or disclaimers that they have acknowledged in writing." *Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742, 752 (E.D. Ky. 2010) (citation omitted). As this Court has previously stated in this case, "the Agreements at issue clearly set forth the terms of Windsor's employment, none of which include the terms that he now claims were breached." (Mem. Op. 6-7).

Windsor has failed to present any additional evidence of fraud on the part of Hutson. Thus Windor's counterclaim, like his affirmative defense—for fraudulent inducement—must fail. *See Steele*, 2009 WL 1562940, at *5. Because Windsor is unable to demonstrate that there is an issue of material fact as to an essential element of his claim, Plaintiff's Motion for Partial Summary Judgment on Count II is granted.

### C.     Count IV: Defamation

Hutson's liability for the alleged defamatory statements of Lewis is dependent upon Lewis's relationship with Hutson as an independent contractor, employee, or agent, at the time the statements were made. While Windsor's Response to Hutson's Motion for Summary Judgment asserts Hutson's liability for allegedly defamatory statements made by Carson, Count IV of the Windsor's counterclaim specifically alleges that Hutson slandered and defamed Windsor through the actions of Lewis "as an agent, in the scope of his employment with Hutson, and [these] were the actions of Hutson." (Countercl. 20). Thus, the question of Hutson's liability, for the purposes of the present Motion for Partial Summary Judgment, is solely dependent on Lewis's relationship with Hutson at the time of the statements.

Generally, the party retaining an independent contractor is not liable for the tortious conduct or negligence of the independent contractor. *City of Hazard Mun. Hous. Comm'n v. Hinch*, 411 S.W.2d 686, 688 (Ky. 1967) (citing *Smith v. Gennett*, 385 S.W.2d 957 (Ky. 1964)). An employer, however, may be held liable for the torts of its employees pursuant to the doctrine of respondeat superior. *See, e.g.*, *Shedd Brown Mfg. Co. v. Tichenor*, 257 S.W.2d 894, 895-96 (Ky. 1953) (citation omitted). Whether an individual is an independent contractor or an employee "is not to be determined by a general rule of law, but by the facts in the case." *Am. Sav. Life Ins. Co. v. Riplinger*, 60 S.W. 2d 115, 117 (Ky. 1933) (citation omitted). Similarly, a principal may be held liable to third parties for the tortious acts of an agent pursuant to the doctrine of respondeat superior. *Home Ins. Co. v. Cohen*, 357 S.W.2d 674, 676 (Ky. 1962). As in distinguishing an independent contractor and an employee, determining whether a relationship is one of agency or independent contractor is a fact-specific inquiry where the substance of the

relationship will prevail over the form. *United Eng'rs & Constructors, Inc. v. Branham*, 550 S.W.2d 540, 543 (Ky. 1977).

Under Kentucky precedent, there is a nine-factor test to determine whether a particular individual is an independent contractor or employee:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer; and
> (i) whether or not the parties believe they are creating the relationship of master and servant.

*Sam Horne Motor & Implement Co. v. Gregg*, 279 S.W.2d 755, 756-57 (Ky. 1955) (citation omitted) (internal quotation marks omitted). No one factor is determinative, though the extent of "control" is often the key distinction between an employee and an independent contractor. *Shedd Brown Mfg. v. Tichenor*, 257 S.W.2d 894, 896 (Ky. 1953) (quoting 2 Am. Jur. *Agency*, § 8).

Applying those factors in the present case, Windsor has presented evidence raising a question of material fact. First, there is a material factual issue regarding the extent of control Hutson exercised over Lewis. Determination of control "requires careful consideration of the principal's actual or potential control over the particular activity in which the alleged agent was engaged at the time he injured another." *Id.* While Hutson maintains that Lewis was at all times acting as an independent contractor and exercising independence in his judgments and his work, there is evidence that this was not the case. Lewis reported directly to several of Hutson

executives during his time with the company, including Hutson's president and retail finance manager. Additionally, the record shows that Lewis was intimately involved in discussions with Hutson executives about the company's sales strategies, decisions about what product markets the company would pursue, as well as decisions about selling and credit terms. (Def.'s Resp. to Pl.'s Mot. for Summ. J. Ex 2-3, DN 58-1). Finally, Lewis met and corresponded with customers and prospective customers representing Hutson and purported to speak on the company's behalf, (Def.'s Resp. to Pl.'s Mot. for Summ. J. Ex 2-3). In fact, it was in this capacity that Lewis allegedly made the defamatory statement. (Carson Dep. 9:1-11:25, DN 58-2). Drawing all reasonable inferences in favor of the non-moving party, it seems unusual that Hutson would allow such decisions and actions to be made unilaterally and independently by a contractor absent control by the company.

The issue of whether the Lewis was engaged in a distinct occupation or business also weighs against summary judgment. The record seems to indicate that Lewis wore many hats for Hutson. As previously discussed, he was part of decision-making teams on sales strategies, product markets, and financing. Furthermore, Carson describes Lewis's role as being a "sales representative," which is further corroborated by his presence at trade shows and his role in negotiations with Anghel. Finally, email correspondence as well as the depositions of Hutson executives indicate that Lewis was tasked with ensuring Hutson was "compliant on the way [it] would invoice and ship goods, as far as to meet the compliance with countries" and to "point [it] in the right direction" to mitigate liability. (Carson Dep. 18:5-10; Ellison Dep. 22:18-20, DN 58-3). Undoubtedly these roles have some crossover and codependence; however, there are elements that raise issues regarding the exact character of Lewis's role with Hutson.

The factor involving the provision of instrumentalities, tools, and the place of work also weighs against summary judgment. Windsor has not presented extensive evidence as to this element. The record, however, shows that Lewis was supplied with a company email account for conducting business on Hutson's behalf, as well as business cards printed with Hutson's sister company's information, which he distributed to clients and prospective clients at trade shows while representing Hutson. This is some evidence of Hutson supplying Lewis instrumentalities for conducting business on behalf of the company. Ultimately, this factor is not highly probative independent of the other considerations, but as employment status is a fact-based inquiry, this evidence contributes to the employment vs. contractor determination.

The facts relating to the length of Lewis's relationship with Hutson also involves a material issue of fact. The record indicates that Lewis began working with Hutson in late 2011, and continues to work for the company, a period of nearly four years. (Carson Dep. 15:3-12; Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. 9). "If the employment has continued for a considerable length of time, and does not have a termination date fixed, the relationship of employer and employee is likely, as distinguished from that of independent contractor." *Ratliff v. Redmon*, 396 S.W.2d 320, 326 (Ky. 1965). Because Hutson has failed to present any agreement or contract outlining a fixed termination date or set length of employment and considering the facts in light most favorable to the non-moving party, this factor contributes to the determination Lewis's employment status.

In addition, there is evidence in the record relating to the factor of whether Lewis's work is a part of the regular business of the employer. As previously discussed, Lewis's role with Hutson involved making decisions about sales strategies, product markets, and financing. Additionally, Lewis acted as a sales representative and was in direct contact with Hutson's

14

international clients. As both Hutson and Global Ag Solutions are involved in the business of marketing and selling agricultural products to clients, it would appear that Lewis may have been closely and directly involved with not only the regular, but fundamental, business of Hutson.

Finally, the Court notes that the parties' belief is the final factor weighing against summary judgment. In considering this factor, the Court cannot merely rely on the label Hutson chooses to attach to the relationship, or its assertions about the relationship it intended to form with Lewis. Perhaps the most useful evidence for this factor is a written agreement between the parties that details the relationship and describes its contours; however, Hutson has not presented any such document. Instead, this Court must consider the parties' conduct. As previously discussed, there is evidence of the parties' conduct raising a question as to the intentions of the parties. Additionally, there is evidence in the record that Global Ag Solutions, in correspondence to clients, presented Lewis as an employee in charge of Hutson's Latin America sales. (Def.'s Decl. II Ex. 5, DN 58-1). The document, sent to customers following Windsor's dismissal, does nothing to differentiate Lewis from other Hutson employees, and represents Lewis as the person to whom communications should be directed for Latin American matters. Disregarding the labels attached by the parties, the conduct of Hutson and Lewis contributes to a question of material fact as to the relationship intended by the parties.

Hutson contends that even if an employer/employee relationship existed, that relationship was between Lewis and Global Ag Solutions, and thus Hutson has no liability. The record, however, demonstrates that Hutson and Global Ag Solutions appear to be so intertwined as to raise a genuine question as to which company benefitted from Lewis's employment. Hutson acknowledged that Lewis represented the company in meetings with customers and that Lewis was expected to ensure that the business was "compliant with *Hutson*'s expectations." (Carson

15

Dep. 19:14-15). Furthermore, Hutson acknowledged that the international sales that Lewis was tasked with overseeing were done through both Hutson and Global Ag Solutions, and that invoicing for international sales would be done through either company depending on the circumstances. Hutson relies on Windsor's evidence that Lewis was given a Global Ag Solutions email address and business cards as demonstrating that no relationship existed between Hutson and Lewis; however, this ignores the fact that Ellison and Windsor—whose employment status under Hutson is uncontroverted—were also given Global Ag Solutions email addresses.

As demonstrated above, sufficient evidence has been presented to raise a question of material fact in regard to numerous factors in Kentucky's test for employment status. Furthermore, there remains a genuine issue regarding whether Lewis's employment was for the benefit of Hutson, Global Ag Solutions or both at the time of the allegedly defamatory statement. Because Hutson has failed to demonstrate that no genuine issue of material facts exists as to Lewis's employment status at the time of the allegedly defamatory statements, Hutson's Motion for Partial Summary Judgment as to Count IV of Windsor's Counterclaim is denied.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment (DN 52) is **GRANTED** on Counts I and II but is **DENIED** on Count IV of the Counterclaim.

**Greg N. Stivers, Judge**
**United States District Court**
July 8, 2015

cc: counsel of record